**Thomas McCLOUD, Jr., Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 98–CF–1542.**

District of Columbia Court of Appeals.

Argued Dec. 5, 2000.

Decided Sept. 27, 2001.

Jennifer Lanoff, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Karla–Dee Clark, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese III, and Gregg Maisel, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and FARRELL, Associate Judges, and NEBEKER, Senior Judge.

NEBEKER, Senior Judge:

This is an appeal from convictions after a jury trial of one count of first-degree cruelty to children[1] (against victim V.B.),[2] four counts of second-degree cruelty to children[3] (against victims M.M., T.S.M., V.B., and L.B.), and two counts of simple assault[4] (against victims T.S.M. and C.B.), the lesser included offense of the aggravated assault[5] charges in the indictment. Several of appellant's convictions were for the lesser included offenses of the charges on which appellant had been indicted. Appellant was acquitted of one count of second-degree cruelty to children and one count of aggravated assault. The convictions stemmed from the physical abuse over the course of approximately five months of the six children of appellant's wife, Vera McCloud, three of them his own and three stepchildren. The first-degree cruelty conviction and one of the second-degree cruelty convictions arose from a specific incident on November 11, 1997, in which appellant punched his six-year-old stepdaughter V.B. in the leg, breaking her femur. Except for the November 11th incident, the children's testimony was corroborated by an adult eyewitness.

Appellant challenges all of his convictions on the grounds that (1) the trial court abused its discretion in denying appellant's motion to sever, and (2) his Sixth

---

1. D.C.Code § 22–901(a) (1996).

2. Given their status as minors, throughout the briefs and the record the children were referred to by their initials in order to protect their privacy. The children were referred to as L.B., C.B., V.B., T.S.M., M.M., and T.K.M., aged eleven, seven, six, four, two, and less than one year respectively at the time of trial.

3. D.C.Code § 22–901(b) (1996).

4. D.C.Code § 22–504 (Supp.2000).

5. D.C.Code § 22–504.1 (1996).

Amendment Confrontation Clause right was violated when the trial court effectively foreclosed cross-examination of the adult eyewitness as to possible bias since her three adult sons were, at the time of trial, being investigated for sexual abuse of two of the children. The trial judge had ruled *ex parte* that the prosecution did not need to divulge to the defense the factual basis for that predicate for bias. The court holds that if the witness knew of the charges against her sons, appellant was denied his right of confrontation. The record is remanded for further proceedings, detailed below. We also hold that the denial of severance was not error. Thus, the convictions as to the November 11, 1997, incident are affirmed.

The prosecution's theory of the case was that appellant had systematically disciplined the children with violent and excessive force. Appellant's defense was essentially that someone else, probably the children's mother, had actually caused the injuries with her own violent discipline, and that the children were lying at her behest by blaming appellant.

The three oldest children, L.B., C.B., and V.B., testified in a reasonably consistent fashion to the details of the incident in which V.B.'s leg was broken. L.B. and C.B. also testified more generally about the systematic assaults and injuries that they and the younger children had suffered during the charged period at the hands of appellant. They also testified that they had been beaten by their mother, Vera McCloud, multiple times in a manner similar to appellant's abuse, but that appellant hit harder. However, C.B. also testified that he had been instructed in the past by Vera McCloud that any beatings suffered at her hands should be blamed on appellant. Moreover, each of the three

children testified that they wished to be reunited with their siblings [6] and that people including their mother had told them that, in order to be reunited, they must testify that appellant had beaten all of the children.

Appellant's cousin, Mary Ishmell, was the only adult witness to corroborate the children's testimony about acts of physical abuse for which appellant was charged, except for the November 11th incident. At various times, the six children, appellant, and Vera McCloud had resided with Mary Ishmell and her three adult sons, Robert, Dewayne, and Dominic.[7] During part of the time period charged in the indictment, the late summer and early fall of 1997, only the children lived with the Ishmells, although appellant and Vera McCloud spent time with the children in that home. Ishmell gave eyewitness testimony to appellant's systematic violence against all but the youngest child, T.K.M.

Ishmell also testified that she had seen the children's mother, Vera McCloud, beat them violently and instruct the children that, if Protective Service employees should ask who hit them, they should blame appellant. Ishmell also acknowledged that L.B. and V.B. would lie readily for Vera McCloud. On direct examination, Ishmell testified further that she no longer had any relationship with appellant, and that she and Vera McCloud were no longer speaking as a result of an argument that had taken place in the courthouse on the preceding day.

After the jury had been selected but not sworn, the prosecutor approached the bench *ex parte* and informed the trial court that he had recently learned of allegations that Mary Ishmell's three sons had sexually abused L.B. and V.B.[8] Recogniz-

---

6. The children were living in separate foster homes at the time of trial.

7. The living arrangements of appellant and his family changed frequently.

8. L.B.'s accusation against Robert and De-

ing that this new evidence created a potential bias issue, the prosecutor nonetheless argued to the trial court that it lacked relevance sufficient to require disclosure to the defense because, first, the prosecution had already given the defense "plenty of other bias information," including the allegation that Robert had raped Vera McCloud, thereby fathering the youngest child, T.K.M., and that appellant had subsequently threatened both Robert and Mary Ishmell;[9] and second, it was not known whether Mary Ishmell was aware of the allegations against her sons.

The trial court agreed with the prosecutor, ruling that the allegations against Mary Ishmell's sons were not relevant, "either as probative or impeaching evidence," and thus need not be revealed to the defense, although the court reserved the right to revisit the issue during trial if the circumstances should demand it. When defense counsel asked the trial court if he should be informed of anything that had transpired at the ex parte bench conference, the trial court responded in the negative. The defense remained unaware of the allegations against the Ishmell brothers and the trial court did not revisit its ruling at any point. Apparently, the ex parte revelations became known to appellant when the trial transcript was prepared for this appeal.

### Analysis of Severance Argument

Following a hearing at which appellant's Super. Ct.Crim. R. 14 motion to sever counts for separate trials was considered, the trial court denied the motion largely on the basis of *Gezmu v. United States,* 375 A.2d 520 (D.C.1977). There we held that evidence of earlier domestic violence toward the victim was admissible as relevant to show both malice and motive on the part of the defendant. *See id.* at 522. *See also Hill v. United States,* 600 A.2d 58 (D.C.1991); *Drew v. United States,* 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964) (holding that "other crimes evidence" meeting clear and convincing standard is admissible to show *motive,* intent, absence of mistake or accident, common scheme, or identity). The trial court concluded that, given the allegations of appellant's abuse against all six children, each of them stood "in the same relationship" to the defendant and, thus, as a group formed one unit essentially equivalent to a domestic partner of appellant under *Gezmu.*

Appellant argues that the trial court's denial of his motion to sever was erroneous in that it wrongly treated the children as a unit under the motive exception. Appellant contends that acts of violence against one child would not demonstrate a hostile motive against any of the other children individually, nor, absent more, would it demonstrate that appellant had a hostile motive toward the others based upon their *membership* in the sibling group. *See Robinson v. United States,* 623 A.2d 1234, 1239 (D.C.1993) (citing *People v. Lampkin,* 98 Ill.2d 418, 75 Ill.Dec. 260, 457 N.E.2d 50, 55 (1983), for the proposition that evidence of uncharged acts of hostility against a class which includes victim may be admissible).

---

wayne Ishmell alleged that each had routinely assaulted her sexually over the course of two to three years, beginning when she was eight years old. Both pled guilty to second degree child abuse in early 1999, after the trial of this case.

9. The jury did not hear the details of this allegation on direct examination, and the defense chose not to bring them to light on cross-examination, ostensibly because the prosecution had indicated its belief that such questioning would open the door to admission of evidence of appellant's subsequent threats against the Ishmells.

The government responds that "evidence of appellant's other acts of physical abuse against the children was properly admitted as probative of motive," *see, e.g., Flores v. United States,* 698 A.2d 474, 482 (D.C.1997) (following *Gezmu, supra* ), as well as identity because the manner in which appellant abused the children was distinctive. *See Drew, supra,* 118 U.S.App.D.C. at 16, 331 F.2d at 90.

■ "We will reverse the denial of a motion to sever counts under Super. Ct. Crim. R. 14 only upon a clear showing of abuse of discretion." *Ifelowo v. United States,* 778 A.2d 285, 289 (D.C. 2001), *citing Parks v. United States,* 656 A.2d 1137, 1139 (D.C.1995). In the instant case, we hold that there was no abuse of discretion by the trial judge and that denial of the motion for severance was proper.

■ Appellant's other acts of physical abuse towards his children were properly admitted to prove motive and identity. Appellant asserts that acts of violence against one child would not demonstrate a hostile motive against any of the other children. However, we have held not only that prior bad acts against a victim can be admitted against a defendant to show motive of hostility against that same victim, but also, contrary to appellant's assertion, that prior bad acts against third parties can be admitted to show motive of hostility against certain other individuals. "[W]e see no reason to artificially distinguish between those situations where the victim of the initial wrongful conduct and the ultimate crime are identical, and where the ultimate victim is a third party with a clear nexus to the initial misconduct." *Mitchell v. United States,* 629 A.2d 10, 14 (D.C. 1993). *See also Robinson, supra,* 623 A.2d at 1239 (noting that "[t]he prosecutor's case for admissibility is strongest when the sole object of the hostility is the victim . . . . Courts have also admitted evidence of acts evidencing hostility against a class which included the victim," *quoting* EDWARD J. IMWINKELREID, UNCHARGED MISCONDUCT EVIDENCE § 3:18 at 3–46 (1984)(footnotes omitted)). From *Mitchell* follows the proposition that misconduct against members of a class may be admitted against an ultimate victim where that ultimate victim has a strong enough connection to the class members subjected to the initial misconduct. If, for example, one child is present when a sibling is beaten by a parent, the misconduct against the sibling may be used against the parent in a separate prosecution for misconduct against the first child because the first child has a strong enough connection to the sibling and is clearly part of a class—children—which includes both siblings.

■ "In order for evidence of other offenses to be admissible, the trial court must find: i) that the defendant committed the other offenses by clear and convincing evidence; ii) that the evidence of the other offenses is directed to a genuine, material and contested issue in the case; iii) that the evidence is relevant to the issue beyond demonstrating the defendant's criminal propensity; and iv) that the evidence is not more prejudicial than probative." *Flores, supra,* 698 A.2d at 482, *citing Robinson, supra,* 623 A.2d at 1238. On the last factor, and the only one which need be examined in this decision, the test is "whether the prejudicial impact of the evidence substantially outweighs its probative value." *Johnson v. United States,* 683 A.2d 1087, 1099 (D.C.1996), *cert. denied,* 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997).

First we turn to the task of weighing the prejudice to which Appellant was subjected due to the denial of the severance motion. Appellant was not convicted of all charges, although he was convicted of the most serious, first-degree cruelty to children. *See Parker v. United States,* 751

A.2d 943, 948–49 (D.C.2000) (refusing to reverse for prejudice where defendant convicted of more serious of joined charges, acquitted of lesser of joined charges). In fact, appellant was acquitted of several charges, and the jury downgraded some of his convictions to the lesser included offenses of the crimes for which he was prosecuted. The selectivity in the jury's verdict against appellant demonstrates that continued joinder of the charges did not cloud the jurors' minds such that they viewed evidence of one crime as propensity evidence for each of the other crimes. *See id.; cf. Sams v. United States,* 721 A.2d 945, 955 (D.C.1998) (holding that the jury's differing verdicts as to co-defendants established the ability to assess the charges against each independently), *cert. denied,* 528 U.S. 1135, 120 S.Ct. 977, 145 L.Ed.2d 928 (2000).

Second, we turn to the relative probative weight of the evidence, where our review of the record reveals that, despite the lack of direct corroboration by an adult witness, the evidence of the November 11, 1997 incident was considerably stronger than the evidence supporting the other charges. The testimony supporting the other charges was not specific as to the date and surrounding circumstances. By contrast, the three complainants each testified in considerable detail as to what transpired on November 11, 1997, and the testimony of each was substantively consistent with that of the other two. Each complainant also discussed with a varying degree of detail the events leading directly to appellant's assault on V.B., as well as what transpired following the incident. Further, medical testimony indicated that V.B.'s injury could well have been caused by the type of blow delivered by appellant to her leg as described by the three complainants.

In weighing the aforementioned factors of probativeness of the evidence and preju-dice to the appellant, we afford great deference to the trial court's determination that any prejudicial impact caused by evidence of other misconduct due to the joinder of the offenses did not "substantially outweigh" the probative nature of the evidence brought about by joinder. Thus, we hold that the trial court did not abuse its discretion in denying appellant's motion to sever offenses. Accordingly, we sustain the denial of the severance of counts.

### Analysis of Confrontation Clause Argument

Appellant asserts that his Sixth Amendment Confrontation Clause right was abrogated by the trial court's *ex parte* ruling because it foreclosed any opportunity for appellant to cross-examine a key government witness as to an additional predicate for bias that was highly relevant. Appellant contends that, as a result of the allegations against her sons, Mary Ishmell may have testified falsely against him in order to curry favor with the government on behalf of her sons and to deflect blame from them, as well as to protect herself from liability as the *de facto* guardian of the children when some of the alleged sexual abuse may have occurred.

The government contends that appellant's Sixth Amendment argument focuses on the wrong legal issue because the situation calls for a standard analysis of the prosecution's duty to disclose evidence to the defense under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that the failure of the government to disclose to the defense material information favorable to the accused violates defendant's due process rights and that constitutional error results when the absence of that information caused defendant to be denied a fair trial). *See also McCoy v. United States,* 760 A.2d 164, 183–84 (D.C.2000). The government argues that appellant has failed to meet the

*Brady* doctrine's demand that he demonstrate a reasonable probability that, had information about the allegations of sexual abuse by the Ishmell brothers been disclosed, it would have led to a different outcome at trial. *See McCoy, supra,* 760 A.2d at 183–84.

As an initial matter, we address the government's contention that we should approach appellant's argument as being one more properly characterized as an assertion of a *Brady* violation. Our opinion in *Bennett v. United States,* 763 A.2d 1117 (D.C.2000), is instructive as to why *Brady* does not furnish the correct standard in the case before us. *See id.* at 1122, 1125 (applying the harmless error standard where defense requested *Brady* information from the government about a key witness' prior non-conviction bad act and trial court's error precluded defense from receiving that evidence for use in cross-examination of the witness).

Bennett sought to cross-examine a key government witness about the witness' alleged efforts to obstruct a witness in a separate case charging him with murder. *See id.* at 1121. At the earlier trial, the government had filed a motion *in limine* seeking to introduce evidence of the witness' obstructive acts. *See id.* at 1120–21. Bennett's counsel asked the court to order the prosecution to turn over evidence of the witness' obstruction. *See id.* at 1121. The prosecutor offered to disclose its evidence to the court *ex parte,* but argued (1) that production would not be required under *Brady* because it would be collateral to the witness' credibility in Bennett's case, and (2) that "the factual predicate for Bennett's request was 'absolutely lacking.'" *See id.* Bennett's trial judge declined to review the evidence and denied Bennett's request for disclosure, ruling that the witness' attempted obstruction was not sufficiently relevant to his veracity such that Bennett could cross-examine him on it.

*See id.* at 1121–22. We reversed the trial court, holding first that the witness' alleged obstruction attempt bore directly on his veracity and thus qualified as a subject for cross-examination. *See id.* at 1123–24. Second, we held that *Brady* did not provide the proper standard in essence because, as in the case before us, the preclusion of cross-examination was caused by the trial court's error in failing to recognize the relevance of the evidence:

> [W]e do not believe that *Brady* furnishes the correct standard for evaluating prejudice to the defense in this case, because it is not a case of suppression of evidence by the government. Rather, ... the trial court's erroneous ruling prevented it from being used.

*Id.* at 1125. We also noted that, at the time of the trial court's erroneous ruling, Bennett had been well aware of the witness' obstructive act because the government had "publicized" it through its *in limine* motion and its attempted use of evidence of the obstruction at the witness' own murder trial. *See id.* In fact, Bennett's request for more information from the government triggered the erroneous ruling.

Although in the case before us appellant was not aware of the charges against the Ishmell brothers, the situations still bear important similarities. The trial court, in a ruling based on its failure to recognize the relevance of the evidence, *see* discussion *infra,* kept the evidence from being used by the defense, thereby precluding a relevant inquiry as to bias. Moreover, unlike defense counsel in *Bennett* who was at least aware that the evidence in question existed in some form and thus was able to argue for its production, appellant's trial counsel never had any opportunity to argue why the allegations against the Ishmell brothers would be relevant. By tendering the evidence to the trial court *ex*

*parte*, the prosecution was in essence seeking an advisory opinion as to whether it was required to disclose the information. However, this lack of awareness on the part of defense counsel should not convert the question before us back into a *Brady* issue. Rather, it bolsters appellant's argument that the trial court's erroneous *ex parte* ruling amounted to a violation of his right under the Confrontation Clause. Had appellant been afforded an opportunity to counter the prosecutor's *ex parte* arguments as to why evidence of the allegations lacked relevance, he could have demonstrated to the judge both the relevance of the allegations to Ishmell's bias and the theory on which that bias was based. However, the trial court, by failing to provide a neutral forum on this point, foreclosed both the opportunity to argue these points and, more importantly, any opportunity to cross-examine as to this basis for bias. Therefore we decline the government's invitation to employ the *Brady* standard to this case, applying instead the constitutional harmless error standard of *Chapman v. California*, 386 U.S. 18, 22–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See Bennett, supra*, 763 A.2d at 1122, 1125.

The Confrontation Clause of the Sixth Amendment to the Constitution provides a criminal defendant the right to confront adverse witnesses. That right is "subject to reasonable limits imposed at the discretion of the trial judge." *Scull v. United States*, 564 A.2d 1161, 1164 (D.C. 1989). However, the broad discretion afforded the trial court as to the extent of cross-examination "cannot ... justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony." *See Springer v. United States*, 388 A.2d 846, 855 (D.C.1978) (citing, *inter alia*, *Gordon v. United States*, 344 U.S. 414, 423, 73 S.Ct. 369, 97 L.Ed. 447 (1953)). "An important function of [the right of confrontation] is the exposure of the witness' bias-

es." *Elliott v. United States*, 633 A.2d 27, 32 (D.C.1993). "Bias refers both to a witness' personal bias for or against a party and to his or her motive to lie." *Brown v. United States*, 683 A.2d 118, 124 n. 7 (D.C. 1996) (*Brown I* ) (internal quotations omitted) (citing *Ford v. United States*, 549 A.2d 1124, 1125 n. 2 (D.C.1988)). *See also Jenkins v. United States*, 617 A.2d 529, 531 (D.C.1992) ("[C]ross-examination seeking to ferret out bias takes on enhanced significance where the credibility of the key government witness is in issue."). As we stated in *Ford*, "[t]he Supreme Court has established that the refusal to allow any questioning about facts indicative of bias from which the jury could reasonably draw adverse inferences of reliability is an error of constitutional dimension, violating the defendant's rights secured by the Confrontation Clause." *Ford, supra*, 549 A.2d at 1126 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)).

We hold that the evidence of allegations and ensuing investigation of sexual abuse by the Ishmell brothers was potentially highly relevant to Mary Ishmell's bias, and therefore the trial court was in error when it prevented disclosure of that evidence to the defense to permit inquiry into whether Mary Ishmell was aware of the investigation. As the only adult witness who could corroborate the testimony of the three young complainants regarding appellant's abuse during the period charged in the indictment, Mary Ishmell was a very important witness in the government's case. Evidence that the government was investigating allegations of sexual abuse by her sons would raise the strong possibility of a "prototypical form" of bias on the part of Mary Ishmell. Assuming she was aware of the investigation, she could have a motive to favor the prosecution's case in hope

of receiving beneficial treatment for her sons with regard to investigation and prosecution of the allegations, and possibly for herself as an accessory, in violation of D.C.Code § 22–1806 (2001), and as a *de facto* guardian of the children during the time of some of the alleged incidents. *See Van Arsdall, supra,* 475 U.S. at 679–80, 106 S.Ct. 1431; *Jenkins, supra,* 617 A.2d at 533 (listing that a witness' motive to curry favor with the prosecution is a "prototypical form of bias"), *citing Van Arsdall* and *Davis v. Alaska,* 415 U.S. at 311, 94 S.Ct. 1105.

The government argues on appeal, as it did to the trial court, that the allegations against the Ishmell brothers lacked relevance because the defense had available to it other information that was more relevant to Mary Ishmell's bias. The government points to its disclosure during pretrial discovery that Dewayne Ishmell "sometimes hit the children on their butts with a belt." In fact, C.B. testified on direct examination that Dewayne had hit the children, but L.B. contradicted him on cross-examination by saying that Dewayne had not hit them, but had only taken his hand and "plucked" them.

■ Even absent the contradictory testimony of the complainants as to whether Dewayne Ishmell physically abused them, evidence that the Ishmell brothers may have hit the complainants would not provide nearly the same level of motivation for Mary Ishmell to lie as would evidence of allegations that they had sexually abused the complainants. Moreover, preclusion of an entire foundation for bias that was relevant and otherwise admissible is not corrected by the fact that other lines of cross-examination may have been permitted fully. *See Brown I, supra,* 683 A.2d at 127 n. 10 ("[T]he improper restriction of an entire line of cross-examination regarding a witness' motive to lie is an error of constitutional dimension."); *Guzman v.*

*United States,* 769 A.2d 785, 793 (D.C. 2001); *Ford, supra,* 549 A.2d at 1126.

■ The government likewise contends that the evidence of sexual abuse was not sufficiently relevant because the prosecution did not know whether Mary Ishmell was even aware at the time of her testimony that her sons were being investigated in connection with the allegations. Ordinarily, the threshold materiality that a defendant must demonstrate to the trial court as a predicate for bias cross-examination, is a proffer showing "a well-reasoned suspicion" as to the foundation for bias. *See Brown I, supra,* 683 A.2d at 124–25. Such a proffer would include evidence that the witness is aware of the facts forming the basis of the suspected bias. *See Ifelowo, supra,* slip op. at 31 n. 13 ("Impeachment evidence is not material if the witness does not have knowledge of the underlying fact," *quoting Williams v. Scott,* 35 F.3d 159, 162 (5th Cir.1994)). Here, however, the government essentially supplied the proffer as to the subject matter of the line of bias and, as a result of the *ex parte* nature of its revelation to the trial court and the resulting ruling, the defense never had the opportunity to investigate and proffer additional evidence that Mary Ishmell was aware of the allegations at the time of trial.

■ Given our holding that appellant's Sixth Amendment right of confrontation may have been violated, we must decide whether the error can be deemed harmless beyond a reasonable doubt under *Chapman, supra,* 386 U.S. at 24, 87 S.Ct. 824. "Under our harmless error test, it must be clear beyond a reasonable doubt (1) that the defendant would have been convicted without the witness' testimony, or (2) that the restricted line of inquiry would not have weakened the impact of the witness' testimony." *Scull, supra,* 564 A.2d at 1166 (internal quotations omitted) (citing

*Springer, supra,* 388 A.2d at 856). Given the complainants' expressed desire to be reunited with their siblings, evidence that they would lie at their mother's request, and their admissions that they had been instructed to testify against appellant in order to be reunited, Mary Ishmell's testimony as the sole adult witness was quite significant. Therefore, we cannot say beyond a reasonable doubt that appellant would have been convicted had Mary Ishmell known of the charges against her sons and been cross-examined as to her bias to curry favor with the government.

We point out, however, that appellant's first-degree cruelty to children conviction and his simple assault conviction that stem from the November 11, 1997, incident in which V.B.'s leg was broken were not supported by Mary Ishmell's testimony. Moreover, that incident was described in the testimony of all three complainants with specificity and reasonable consistency. Those convictions are free of the potential infirmity of the others.[10]

Accordingly, we deem the record with respect to the four counts of second degree cruelty to children and one count of simple assault to be remanded so that the trial court may promptly conduct an inquiry as to whether Mary Ishmell was aware at the time of her trial testimony of the allegations of sexual abuse against her sons or the acts underlying those allegations. *See* D.C.Code § 17–306 (2001). At the conclusion of these proceedings, the parties shall inform this court of the trial judge's inclination either to award a new trial as to those counts or to permit them to stand. *See Smith v. Pollin,* 90 U.S.App.D.C. 178, 179–80, 194 F.2d 349, 350 (1952). If the trial court is inclined to leave those convictions intact, the record on appeal will promptly be supplemented by a transcript of those proceedings.

**10.** The court notes that all sentences run concurrently with the first-degree cruelty conviction stemming from the November 11, 1997 incident.

*Conclusion*

The convictions of the November 11, 1997 incident are affirmed. The record is deemed remanded for further proceedings as set forth above.

*So ordered.*